UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
**CENTRAL DIVISION at LEXINGTON**

| | |
|---|---|
| MAJENTA MOOTOOR, ) | |
| ) | |
|     Plaintiff, ) | Case No. |
| ) | 5:18-cv-645-JMH-MAS |
| v. ) | |
| ) | **MEMORANDUM OPINION** |
| EASTERN KENTUCKY UNIVERSITY, ) | **AND ORDER** |
| ) | |
|     Defendant. ) | |
| ) | |

\*\*\*

This matter is before the Court on Defendant Eastern Kentucky University's ("EKU") Motion for Summary Judgment [DE 25]. Having considered the matter fully, and being otherwise sufficiently advised, EKU's Motion for Summary Judgement [DE 25] will be granted.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Majenta Mootoor was enrolled as a student at EKU from the Fall of 2014, as an undergraduate, until her dismissal from the Occupational Therapy ("OT") Graduate Program in 2018. [DE 25 at 1]. Prior to her enrollment at EKU, Mootoor earned an associate's degree from Somerset Community College in May 2014, and transferred to EKU to pursue a bachelor's degree in occupational science. [*Id.*, at 4]. As Mootoor began her studies at EKU in the Fall of 2014, her professor and academic advisor, Dr. Renee Causey-Upton, became concerned about Mootoor's mental

1

health. [*Id.*]. On August 30, 2014, Causey-Upton relayed her concerns to Dr. Colleen Schneck, the Associate Dean of EKU's College of Health Sciences and Department Chair for the Occupational Therapy Department. [DEs 25 at 5; 25-10]. At the advice of Schneck, Causey-Upton documented her concerns and met with Mootoor on September 2, 2014, to discuss decreased participation and progress in her class. [DEs 25 at 4-5; 25-10; and 25-11]. During the meeting, Mootoor told Causey-Upton that she had an undeclared disability. [DE 25-11]. This was the first time Mootoor reported having a disability.

Upon learning of Mootoor's disability, Causey-Upton advised Mootoor to contact the EKU Office of Services for Individuals with Disabilities (OSID) for testing to determine the need for accommodations to support Mootoor's academic progress. [*Id.*]. Mootoor was also advised that until OSID could recommend specific accommodations, she could schedule meetings with Causey-Upton to receive additional clarification on assignments and due dates in her class. [*Id.*].

Thereafter, Mootoor was diagnosed with a learning disability that impacts her written expression and reading comprehension. [DE 25 at 5]. On November 6, 2014, Mootoor's professors received an accommodation letter from OSID which provided that Mootoor be afforded: (1) extended, double time for exams and the use of text-to-speech software, or that instructors read the exams to her; (2)

test question clarification; use of a digital device to record lectures, and/or have a copy of prepared notes if available; and (3) clarification and support for papers and other major assignments, feedback, discussion of timelines, and review of drafts. [DE 25-12].

Around the same time, Causey-Upton met with Mootoor to discuss her accommodations and her progress in the occupational science program. [DE 25 at 5]. At the meeting, Causey-Upton expressed concern about an "F" that Mootoor received in one of her midterm exams. [*Id.*]. Though Mootoor ensured her grades were improving, Causey-Upton discussed other potential degree programs with less rigor that she might consider. [DE 25-13]. Causey-Upton also advised that Mootoor may have difficulty meeting the requirements of the occupational science program and progressing into the OT graduate program. [*Id.*].

On November 11, 2014, Mootoor and Causey-Upton had a follow-up meeting to advise on which courses Mootoor needed to take in the following semester and as prerequisites for the OT graduate program. [*Id.*]. Mootoor reported that she planned to meet with another college advisor to discuss alternative degree and career options in healthcare. [*Id.*]. Causey-Upton and Mootoor also discussed concerns the Mootoor's accommodations in school may not translate into a work environment as an OT, and that Mootoor may

3

have difficulty graduating and progressing through the OT graduate program. [*Id.*].

In February 2015, the following semester, Causey-Upton met with one of Mootoor's professors, Dr. Julya Westfall, because of a poor grade received on her first exam which resulted in an early alert notification to Causey-Upton as Mootoor's advisor. [DE 25 at 6]. Essentially, although Mootoor received accommodations, she failed to utilize any of them during the exam—including using less than half of the time allotted and failing to ask for clarification on any questions. [DE 25-14 at 2]. As a result of the early notification, Causey-Upton met with Mootoor on March 10, 2015, to discuss her performance in Westfall's course. [DE 25 at 6]. At the meeting, Mootoor explained that her poor performance on the exam was due to having another exam on the same day, that the exam location was unfamiliar, and that the questions were difficult to understand. [DE 25-15 at 2]. Mootoor then filed a complaint with EKU's Office of Equity and Inclusion ("OEI"), alleging that her accommodations were not being honored by Westfall. [DE 25-16]. Shortly thereafter, OEI administratively closed Mootoor's complaint after finding that it did not implicate EKU's non-discrimination and harassment policy. [DE 25-17].

In her final two semesters of the undergraduate program, the academic year between Fall 2015 and Spring 2016, Mootoor allegedly had accommodation issues with two of her professors—Dr. Amy

4

Marshall and Dr. Camille Skibuk-Peplaski. [DE 1-1 at 3; DE 25-9 at 6-8]. However, there is little in the record to precisely describe these events.[1] In any case, Mootoor developed as a student and went on to graduate with her bachelor's degree from EKU in the Spring of 2016. [DE 25-18; DE 31 at 2].

Upon successful completion of her undergraduate studies, Mootoor was accepted into the OT graduate program at EKU. [DE 31 at 2]. Early in at the beginning of the program, Mootoor met with her professors, Dr. Dana Howell and Dr. Elaine Fehringer, to discuss accommodations. [DE 25 at 8-9; DE 25-9 at 8-10]. In Fehringer's course which included field experience, Mootoor was assigned her own client, rather than being assigned a client with a student-partner. [DE 25 at 9; DE 25-9 at 8-10]. Although no evidence has been offered to support it, Mootoor has alleged Fehringer failed to accommodate her by providing minimal feedback on her "SOAP" notes—notes that are written at the end of a therapy session. [DE 1-1 at 3-4; DE 25-9 at 8-10].

---

[1]  In her deposition, Mootoor repeatedly explained that she could not remember the details, only that there were issues receiving additional feedback from Marshall and Skubuk-Peplaski. [DE 25-9 at 6-8]. She explained that she discussed accommodations with Marshall and Skubik-Peblaski, including the need for extra feedback. [*Id.*]. Beyond the Complaint and deposition testimony, however, there is no other evidence or documentation offered by the parties. Further, Mootoor's Response to EKU's Motion for Summary Judgment [DE 31] completely passes over any issues that allegedly occurred during her undergraduate studies.

Following the meeting with Howell, Mootoor received a letter outlining their discussion and the accommodations that would be made in Howell's course. [DE 25-19]. Part of her testing accommodations included the ability to take exams at the OSID. [*Id.*]. Notwithstanding the accommodations, Mootoor received an email about poor performance in Howell's course, though she ultimately passed the course. [DE 25-20].

Notably, part of the requirements for the OT graduate program included completion of several significant field work rotations, where students are placed in various treatment facilities to gain hands-on experience under the supervision of a licensed occupational therapist. [DE 31 at 2]. At EKU, in particular, there were two levels of field work which Mootoor was required to successfully complete—Field Work Level I, a component of the course OTS 871, and Field Work Level II, a component of OTS 845. [DE 31 at 2-3; DE 25 at 29-30, 32-33]. Successful completion of Field Work Level I was a prerequisite for advancing to Field Work Level II.

In Fall 2017, Mootoor was enrolled in OTS 871 and was placed at Rockcastle Middle School for her fieldwork. [DE 31 at 12]. Early in the semester, Mootoor met with Dr. Leslie Hardman, who taught OTS 871, to discuss accommodations. [*Id.*; DE 25 at 11]. Following their discussion about feedback accommodations, Hardman emailed her feedback to Mootoor on October 1, 2017. [DE 25-21]. Hardman

followed up with a second email on October 3, 2017, asking whether Mootoor preferred feedback be sent via written or audio form. [DE 25-22]. Ultimately, they decided Zoom video software would be the best way to provide feedback. [DE 25-9 at 14].

On October 9, 2017, Mootoor emailed Hardman expressing misunderstanding about expectations for her SOAP notes. [DE 25-23]. Hardman responded requesting clarification about Mootoor's concerns and offered to meet with her to discuss further. [*Id.*]. Hardman also informed Mootoor that she had asked Jamica Richards, Mootoor's supervisor at Rockcastle Middle School, to provide both Mootoor and Hardman feedback on Mootoor's performance at fieldwork. [*Id.*]. Hardman and Mootoor eventually met around October 12, 2017. [DE 25-24; DE 25-25].

Following their meeting, Hardman sent Mootoor, and copied her fieldwork coordinators Skubik-Peplaski and Dr. Casey Humphrey, a summary of their discussion. [DE 25-25]. Mootoor responded to Hardman asking why she had included her fieldwork coordinators in the email. [DE 25-24]. Hardman explained that as fieldwork coordinators, it was important to keep them informed about where to appropriately place Mootoor for future fieldwork as she progressed through the OT graduate program. [DE 25-24]. Hardman also told Mootoor it was her responsibility to inform Richards about needed accommodations. [*Id.*]. It is unclear whether Mootoor ever discussed a need for accommodations with Richards; however,

shortly after Mootoor and Hardman's meeting, Richards reached out to Hardman to express concern that Mootoor was struggling with the fieldwork requirements and appropriate professional behavior. [DE 31 at 12; DE 25-5 at 6].

On October 13, 2017, Mootoor filed a complaint with OEI alleging Hardman engaged in disability discrimination for failure to implement her accommodations. [DE 25-26]. Shortly thereafter, on October 24, 2017, Mootoor received her Level I Fieldwork Student Evaluation from Richards. [DE 25-27]. A score of 122 or higher is considered passing, while a score of 121 or below results in a failure of the entire course. [DE 25-27 at 2]. Mootoor received a score of 105.5, thus resulting in a course failure. [DE 25 at 14; DE 25-27]. The evaluation noted that Mootoor had little communication with staff and clients, struggled to manage stress, and had difficulties with utilizing feedback. [*Id.*]. Richards' feedback also explained that Mootoor asked very few questions "until she began to struggle with assignments and grades at EKU." [*Id.* at 6].

On November 16, 2017, Mootoor appealed her grade for OTS 871. [DE 25-29]. In the appeal, Mootoor asserted that her grade had been determined based on her disability. [*Id.* at 33]. While the OTS 871 grade appeal was pending, OEI's disability discrimination investigation resulted in an informal resolution in which Mootoor and EKU agreed to the following:

1) The University's Registrar will administratively withdraw Majenta Mootoor from OTS 871-001 for the Fall 2017 semester. The class will appear as either a Withdraw ("W") or an Administrative Withdraw ("AW") on Ms. Mootoor's transcript, depending on the requirements of the system.

2) Ms. Mootoor will be re-enrolled in OTS 871 for the Spring 2018 semester.

3) The University's Registrar has assured that the tuition Ms. Mootoor paid for OTS 871-001 in the Fall will be credited to her account in the Spring to cover the Spring OTS 871 course. The Registrar has agreed to assist to ensure that this aspect of the resolution runs as smoothly as possible.

4) Ms. Mootoor will only be required to retake the components of OTS 871 that she did not pass in Fall 2017.

5) Dr. Leslie Hardman and Ms. Jamica Richards will not be part, in any manner, of Ms. Mootoor's Spring 2017 OTS 871 course, in which Ms. Mootoor is enrolled. Ms. Mootoor will be assigned a new field work location, field work educator, and field work instructor who has not been directly involved in the present matters.

6) If Ms. Mootoor successfully completes the necessary components of OTS 871 in Spring 2017, she will then be enrolled in Field Work II as quickly as possible.

7) Because of accreditation rules that bind the Occupational Therapy Program, if Ms. Mootoor does not successfully complete OTS 871, this will count as her second failure of OTS 871.

[DE 25-28 at 3]. Notably, the agreement did not address how her withdraw from OTS 871 would be treated once in Level II fieldwork (OTS 845). [*Id.*; DE 31 at 6]. Nevertheless, Mootoor successfully completed OTS 871 upon re-enrollment and moved on to OTS 845 for Level II fieldwork. [DE 25 at 17].

Once in OTS 845, Mootoor began looking at available placement facilities for Level II fieldwork. [*Id.* at 18]. Humphrey and Skubik-Peplaski were directed by Mootoor to not contact facilities about her accommodations. [DE 25-8 at 4]. Mootoor was eventually placed at a Veterans Affairs (VA) hospital, where Jeff Healander was the fieldwork educator. [DE 25 at 4, 18]. Skubik-Peplaski advised that Mootoor would need to deliver a letter of accommodations and discuss the accommodations with Healander. [DE 25-32]. Thereafter, Mootoor's letter of accommodations was revised to include the following: (1) double time for online exams and quizzes, (2) digital recording for notetaking, (3) meeting with instructors for extra feedback on assignments, (4) use of Read and Write software, and (5) no grade deduction for slightly misspelled words, punctuation and grammar. [DE 25-33]. Importantly, for OTS 845 fieldwork, the letter of accommodation also allowed for Mootoor to type SOAP notes onto her laptop using Read and Write software, and provided that she email them to her clinical instructor by the following morning. [*Id.*].

Shortly into Mootoor's placement at the VA hospital for OTS 845, Humphrey and Skubik-Peplaski were informed by Healander of concerns he had about Mootoor's performance and her lack of skills. [DE 25-6 at 8-9; DE 31 at 21]. Healander confirmed that he had received Mootoor's letter and felt that her accommodations could be met. [*Id.*]. Around February 23, 2018, Healander and Mootoor

10

discussed his feedback about her performance, including concerns about her ability to see the "big picture" of her work and observation skills. [DE 25 at 30; DE 25-34].

Soon after, on February 28, 2018, Mootoor was dismissed from the VA hospital by Healander due to her performance and concerns about safety. [DE 25 at 20; DE 25-1]. Among the problems leading up to her dismissal, Healander reported that Mootoor "consistently showed a lack of clinical reasoning and judgment when being with veterans during clinical time." [DE 25-1 at 5]. In addition, there were two events that caused safety concerns. One occurred when Mootoor was assisting a patient with a prosthetic leg and failed to use proper safety precautions. [DE 25 at 20-21; DE 31 at 21]. The other involved a patient with a blood borne disease injuring himself with tools given by Mootoor, after Mootoor had also cut herself while not wearing gloves. [*Id.*].

That same day, Mootoor emailed Skubik-Peplaski, Humphrey, and Lori Davis, the Director for the EKU Equity Center for Student Accessibility. [DE 25-35]. In the email, Mootoor expressed frustration for being dismissed from the VA hospital. [*Id.*]. She also asserted that Healander had not provided any accommodations for her, and that her performance there was due to those lack of accommodations and having been left without sufficient instruction by Healander. [*Id.*].

11

Following Mootoor's email, Davis forwarded the information to OEI for them to look into whether any non-discrimination violations had occurred. [DE 25-41]. Consequently, on March 8, 2018, OEI sent a letter to Mootoor to determine whether she had suffered disability discrimination by Healander, Humphrey, and Skubik-Peplaski. [DE 25-40]. After an investigation, OEI ultimately determined that no violation had occurred. [DE 25-42].

On March 22, 2018, Mootoor filed an appeal for OTS 845, Level II Fieldwork. [DE 25-37]. Essentially, Mootoor contended that she did not receive her accommodations while at the VA hospital, including a lack of proper feedback. [*Id.*]. She also alleged that she had been "red flagged" by Skubik-Peplaski, Humphrey, and Healander. [*Id.* at 4].

As a result of her dismissal from the VA hospital and performance, Mootoor received a score of 65 on her midterm fieldwork evaluation, which is below the 90 required for satisfactory performance. [DE 25-1 at 9]. The OT graduate student handbook at EKU provides the following:

> Being a fully prepared student includes demonstration of professional behaviors and professional identity development which includes the ability to make ethical decisions, follow safety regulations, and demonstrate sound judgment in the area of safety. If a student receives unsatisfactory ratings in any of these fundamental areas of adherence to ethics, safety regulations or judgment in the use of safety on the Level I or Level II performance evaluation, the student will not be offered an opportunity to repeat the Level I and/or Level II Fieldwork until after careful consideration by the Fieldwork Management Committee, and the Department Chair.

12

[DE 25-2 at 3]. Thus, Mootoor was unable to repeat Level II Fieldwork without approval from the Fieldwork Management Committee ("the Committee")—which included, Toby Scott-Cross, Kathy Splinter-Watkins, Dr. Cindy Hayden, and Dr. Mary Clements—and Department Chair, Schneck. [DE 25-36]. Accordingly, efforts were made to meet with Mootoor on March 8, May 11, and May 14, 2018, to no avail. [DE 25-36]. On May 14, 2018, as Department Chair, Schneck sent a letter to Mootoor informing her that the Committee would be meeting on May 21, 2018 to address whether Mootoor would be able to continue in the OT graduate program, and that Mootoor would have the opportunity to present information. [*Id.*]. Mootoor did not attend. [*Id.;* DE 25-38].

On June 6, 2018, following the May 21 Committee meeting, Mootoor received another letter from Schneck. The letter informed Mootoor that the Committee had voted against offering her an opportunity to repeat OTS 845. [DE 25-38]. Although the Committee met again on July 11, 2018, at the request of Mootoor, it ultimately voted again not to offer Mootoor another opportunity to repeat OTS 845, Level II Fieldwork. [DE 25-3]. Thus, Mootoor was dismissed from the OT graduate program.

On November 15, 2018, Mootoor filed her Complaint [DE 1-1] in the Madison Circuit Court claiming that she had been subjected to disability discrimination by EKU's failure to provide

13

accommodations, in violation of the Americans with Disabilities Act ("ADA"), the Rehabilitation Act, and the Kentucky Civil Rights Act ("KRCA"). [DE 1-1 at 1-7]. Mootoor also alleged that she was the victim of retaliation and that her dismissal from the OT graduate program was a breach of contract. [DE 1-1 at 5, 7-8]. On December 17, 2018, EKU removed this matter to this Court. [DE 1]. On February 18, 2020, EKU filed the present Motion for Summary Judgment [DE 25], which shall be discussed further herein. In addition, EKU also filed a Motion in Limine [DE 36], which is also ripe for review.

## II. STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute exists on a material fact, and thus summary judgment is improper, if the evidence shows 'that a reasonable jury could return a verdict for the nonmoving party.'" *Olinger v. Corporation of the President of the Church*, 521 F. Supp. 2d 577, 582 (E.D. Ky. 2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Stated another way, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. "The central issue is 'whether the evidence presents a

14

sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Pennington,* 553 F.3d at 450 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52 (1986).

The moving party has the initial burden of demonstrating the basis for its motion and identifying those parts of the record that establish the absence of a genuine issue of material fact. *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002). The movant may satisfy its burden by showing "that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the movant has satisfied this burden, the non-moving party must go beyond the pleadings and come forward with specific facts demonstrating the existence of a genuine issue for trial. Fed. R. Civ. P. 56; *Hall Holding*, 285 F.3d at 424 (citing *Celotex*, 477 U.S. at 324). Moreover, "the nonmoving party must do more than show there is some metaphysical doubt as to the material fact. It must present significant probative evidence in support of its opposition to the motion for summary judgment." *Hall Holding*, 285 F.3d at 424 (internal citations omitted).

The Court "must construe the evidence and draw all reasonable inferences in favor of the nonmoving party." *Pennington v. State Farm Mut. Automobile Ins. Co.,* 553 F.3d 447, 450 (6th Cir. 2009) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475

15

U.S. 574, 587 (1986)). However, the Court is under no duty to "search the entire record to establish that it is bereft of a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 655 (6th Cir. 2001). Rather, "the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *Id*.

### III. DISCUSSION

EKU moves for summary judgment, asking the Court to dismiss Mootoor's claims with prejudice. [DE 25]. EKU argues that Mootoor's disability discrimination claims under the Rehabilitation Act, the ADA, and the KRCA should be dismissed because Mootoor cannot establish a prima facie case of discrimination. [DE 25 at 27-34]. EKU also contends that Mootoor's retaliation claim fails because she cannot establish a causal link between her OEI complaint, her failure of OTS 845 and dismissal from the OT graduate program; and even so, that EKU had a non-retaliatory reason to dismiss Mootoor. [DE 25 at 34-36]. Finally, EKU maintains that Mootoor cannot establish the existence of a contract and that no such breach occurred notwithstanding the existence of a contract. [DE 25 at 36-39]. Each of the claims will be discussed in turn.

### A. Disability Discrimination Claims

Mootoor alleges EKU discriminated in violation of the ADA, 42 U.S.C. § 12101, the Rehabilitation Act, 29 U.S.C. § 794, and the

KRCA, by failing to provide her with a reasonable accommodation for her disability and for dismissing her from the OT graduate program at EKU. The ADA provides that discrimination includes:

> ...a failure to make reasonable accommodations in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations.

42 U.S.C. § 12182(b)(2)(A)(ii). Although different statutes, the Sixth Circuit has held that Rehabilitation Act and the ADA cases apply the same analysis. *Doe v. Woodford County Bd. Of Educ.*, 213 F.3d 921, 925 (6th Cir. 2000) (explaining that the Sixth Circuit reviews ADA and Rehabilitation claims together because "the purpose, scope, and governing standards of the acts are largely the same"). For the Rehabilitation Act to apply, however, the program or institution must receive federal funds. *Doherty v. Southern College of Optometry*, 862 F.2d 570, 573 (6th Cir. 1998). Similarly, because the KRCA was modeled after the ADA, Kentucky courts look to federal disability discrimination precedent when analyzing claims brought under the KRCA. *Howard Baer, Inc. v. Shave*, 127 S.W. 3d 589, 592 (Ky. 2003).

In order to demonstrate a prima facie case of disability discrimination under the Rehabilitation Act, the ADA, or the KRCA, the Plaintiff must show that she: (1) is disabled as defined by

each statute; (2) otherwise qualified for participation in the program; and (3) being denied the benefits of or being subjected to discrimination in the program on the basis of her disability. *Shaikh v. Lincoln Mem'l Univ.,* 608 F. App'x 349, 353 (6th Cir. 2015); *Kaltenberger v. Ohio College of Podiatric Medicine*, 162 F.3d 432, 435 (6th Cir. 1998).

Although academic institutions must make reasonable accommodations, they are not required "to lower or to effect substantial modifications of standards to accommodate" a person with disability. *Pangburn v. Northern Kentucky University*, No. 9700178, 1998 WL 1595522, *at 2 (E.D. Ky. Dec. 30, 1998) (citing *Southeastern Community College v. Davis*, 442 U.S. 397, 413 (1979)). Notably, academic institutions are afforded great deference in their decisions concerning academic performance and the requirements necessary for promotion or graduation. *Kaltenberger*, 162 F.3d at 435-436. "We should only reluctantly intervene in academic decisions, 'especially regarding degree requirements in the healthcare field when the conferral of a degree places the school's imprimatur upon the students as qualified to pursue [her] chosen profession, a profession whose practitioners are entrusted with life and death decisions." *Shaikh*, 608 F. App'x at 353-354 (quoting *Doherty*, 862 F.2d at 576; and *Manickavasagar v. Va. Commonwealth Univ.*, 667 F. Supp. 2d 635, 643 (E.D. Va. 2009)).

For purposes of this motion, EKU concedes that Mootoor satisfies the first element of the prima facie case for disability discrimination, that she was disabled. [DE at 28]. Therefore, the Court will begin the analysis by looking at the qualification element. A disabled person is "otherwise qualified" to participate in an academic program if she can meet its necessary requirements with reasonable accommodation. *Kaltenberger*, 162 F.3d at 435-436. Ultimately, the burden is on the plaintiff to show that she is otherwise qualified. *Shaikh*, 608 F. App'x at 353. Thus, Mootoor is "otherwise qualified" if she can meet the requirements for the OT graduate program with reasonable accommodation.

As aforementioned, after Mootoor retook the course for Level I Fieldwork, her accommodations were revised in order to address the different components required in fieldwork. The accommodations included: (1) double time for online exams and quizzes, (2) digital recording for notetaking, (3) meeting with instructors for extra feedback, (4) use of Read and Write software, (5) no grade deductions for slightly misspelling, grammar, and punctuation, and (6) for Mootoor to type SOAP notes for her fieldwork onto her laptop using Read and Write software, and emailing them to her instructor the following morning. [DE 25-33]. Despite these accommodations, however, the record shows that Mootoor still had minimal scores on her Level II Fieldwork evaluation. DE 25-1 at 9; DE 25-34].

19

Mootoor contends that EKU failed to accommodate her and that if she had received such accommodations, she would be otherwise qualified to continue the OT graduate program. [DE 31 at 24-34]. Mootoor further alleges at various times that a significant number of people associated with EKU's OT program discriminated against her and attempted to have her dismissed, including Hardman, Skubik-Peplaski, Causey-Upton, Richards, Humphrey, and Healander. [DE 1-1; DE 31 a 4]. Yet, Mootoor has not introduced any such evidence, nor has she demonstrated a failure to receive the accommodations that she had requested, beyond the general allegations listed in her complaint and her deposition testimony. Such conclusory statements and "allegations unsupported by specific evidence are insufficient to establish a genuine issue of material fact." *Mitchell v. Toledo Hospital*, 964 F.2d 577, 585 (6th Cir. 1992).

In fact, the record suggests that despite EKU's efforts to provide accommodations for her, Mootoor continued to struggle with some of the essential skills deemed necessary in the OT graduate program—including her ability to communicate with instructors, staff, and patients, ability to accept feedback, professional judgment, and issues involving safety protocol. [DE 25-27 at 3-10; DE 25-1]. Although Mootoor does point to comments by her academic advisors to consider other academic programs outside of OT, the context of these comments points to concerns about Mootoor's skills and performance. [DE 31 at 33].

The OT handbook describes the expectation that students demonstrate "professional behaviors and professional identity development, which includes the ability to make ethical decisions, follow safety regulations, and demonstrate sound judgment in the area of safety." [DE 25-2 at 3]. Upon considering Mootoor's performance in Level I Fieldwork, the Committee voted against her appeal, though she was nevertheless able to retake the course after the issue was resolved. [DE 25-30]. The Committee again voted against allowing Mootoor to continue Level II Fieldwork, in light of her performance issues and safety violations. [DE 25-3; DE 25-38]. Ultimately, this was also the basis on which she was dismissed from the OT graduate program, and Mootoor has not shown otherwise. [*Id.*].

As the Sixth Circuit has held, "the federal judiciary is ill equipped to evaluate the proper emphasis and content of a school's curriculum." *Kaltenberger*, 162 F.3d at 436. "This judicial deference to educators in their curriculum decisions is no less applicable in a clinical setting because evaluation in a clinical course 'is no less an academic judgment because it involves observations of . . . skills and techniques in actual conditions of practice, rather than assigning a grade to . . . written answers on an essay question.'" *Doherty*, 862 F.2d at 577 (quoting *Bd. Of Curators of University of Missouri v. Horowitz*, 435 U.S. 78, 95 (Powell, J., concurring) (footnote omitted). Here, given the

21

nature of occupational therapy, Mootoor's safety violations at the VA hospital and other performance issues are enough to support the Committee's decisions. Absent any contrary evidence, there is simply not enough to establish a genuine issue of material fact.

In sum, given the evidence actually presented, even when read in the light most favorable to Mootoor, the Court finds Mootoor's disability discrimination claims fail because no reasonable juror could find that EKU failed to reasonably accommodate Mootoor. Thus, EKU is entitled to summary judgment on Mootoor's disability discrimination claims under the ADA, the Rehabilitation Act, and KRCA.

## B. Retaliation Claim

Mootoor alleges that EKU retaliated against her in violation of KRS 344.280 when she filed a complaint with OEI about EKU's failure to implement her accommodations. Section 344.280 of the KRCA prohibits two or more people from conspiring "to retaliate or discriminate in any manner against a person because [she]…has made a charge filed a complaint, testified, assisted, or participated in any manner in any investigation." KRS 344.280(1). Like Mootoor's discrimination claims, retaliation claims under the KRCA are are also interpreted consistently with federal law. *Hallahan v. The Courier-Journal*, 138 S.W. 3d 699, 705-706 (Ky. Ct. App. 2004). To establish a claim for retaliation, Mootoor must demonstrate that: (1) she was engaged in a protected activity, (2) the University

was aware of that protected activity, (3) she suffered a materially adverse action, and (4) a causal link exists between the protected activity and the adverse action. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006); *Niswander v. Cincinnati Ins. Trust Co.*, 529 F.3d 714, 720 (6th Cir. 2008).

In its Motion for Summary Judgment, EKU does not dispute that Mootoor's filing of her OEI complaint constitutes a protected activity. [DE 25 at 34]. Additionally, EKU concedes that the University was aware of Mootoor's complaints, and that dismissal from the OT graduate program qualifies as an adverse action. [*Id.*]. Consequently, the only issue disputed in Mootoor's retaliation claim is whether there is a causal link between the filing of Mootoor's OEI complaint and her failure of OTS 871, OTS 845, and her eventual dismissal from the OT graduate program.

To establish a causal link for a prima facie case of retaliation, Mootoor is required to "proffer evidence 'sufficient to raise the inference that her protected activity was the likely reason for the adverse action.'" *E.E.O.C. v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997) (quoting *Zanders v. Nat'l R.R. Passenger Corp.*, 898 F.2d 1127, 1135 (6th Cir. 1990)). Closeness in time can be one indicator of a causal connection, but temporal proximity, standing alone, is not enough to establish a causal connection for a retaliation claim. *Spengler v. Worthington*

23

*Cylinders*, 615 F.3d 481, 494 (6th Cir. 2010) (internal citations omitted).

Mootoor points to the time between her OEI complaint being filed, and the time of her failure of OTS 845 and ultimate removal from the OT program as evidence of a causal connection. [DE 31 at 35]. Notably, as a non-EKU employee, Healander had no direct involvement in the decision to dismiss Mootoor from the program. Mootoor appears to overlook and counter this by suggesting Skubik-Peplaski and Healander colluded to dismiss her from the program. [*Id.* at 37]. However, like her discrimination claims discussed above, Mootoor has offered no evidence to demonstrate that Healander or anyone else involved was even aware of an OEI complaint. To be sure, Mootoor's dismissal from the VA hospital by Healander on February 28, 2018, resulting in her failure of OTS 845, occurred well before Mootoor's OEI complaint and dismissal from the OT graduate program. [DE 25-1; DE 25-40; DE 25-42]. Moreover, the Committee that eventually voted to disenroll Mootoor from the OT graduate program included Toby Scott-Cross, Kathy Splinter-Watkins, Dr. Cindy Hayden, and Dr. Mary Clements—none of which were involved in Mootoor's OEI complaint. [DE 25-36].

Likewise, Mootoor has failed to offer evidence to couple with the temporal proximity between her complaint and her ultimate dismissal. As a consequence, the time between her OEI complaint and her dismissal from OTS 871 and the OT graduate program,

24

standing alone, is not enough to infer a causal link. *Wasek v. Arrow Energy Services, Inc.*, 682 F.3d 463 (6th Cir. 2012).

Notwithstanding, an intervening legitimate reason for the adverse action can dispel an inference of retaliation based on temporal proximity. *See Wasek*, 682 F.3d at 472. Here, EKU maintains that Mootoor was dismissed from the OT graduate program due to her failing of Level II Fieldwork, which was the result of her safety violations—a "legitimate educational and professional concern." [DE 25 at 35-36]. As noted, the OT Handbook provides:

> If a student receives unsatisfactory ratings in any of these fundamental areas of adherence to ethics, safety regulations or judgment in the use of safety on the Level I or Level II performance evaluation, the student will not be offered an opportunity to repeat the Level I and/or Level II Fieldwork until after careful consideration by the Fieldwork Management Committee, and the Department Chair.

[DE 25-2 at 3]. Consistent with the OT Handbook, the Committee considered whether, in light of Mootoor's safety violations and fieldwork performance, should be allowed to continue the OT graduate program. [DE 25-36]. The Committee reached out to Mootoor multiple times—from March 8, May 11, May 14, and May 21, 2018—for her to present information for the Committee's consideration, and ultimately, having not heard from her, the Committee voted to dismiss Mootoor from the program. [DE 25-36; DE 25-38] After reconsidering with Mootoor in attendance, the Committee again voted to dismiss her from the program. [DE 25-3].

25

Mootoor alleges that her expulsion was due to "pretextual reasons," but again, offers no evidence or explanation to refute EKU's proffered reason beyond mere allegations. [DE 31 at 36]. As aforementioned, in reviewing the substance of academic decisions, "[u]niversity faculties must have the widest range of discretion in making judgments as to the academic performance of students and their entitlement to promotion or graduation," particularly with regard to safety in healthcare professions. *Shaikh*, 608 F. App'x at 353-354 (quoting *Regents of University of Michigan v. Ewing*, 474 U.S. 214, 225 (1985)). Thus, in the absence of evidence demonstrating a causal connection between Mootoor's OEI complaint and dismissal from the OT graduate program, or refuting EKU's proffered non-retaliatory reason for her dismissal, Mootoor's retaliation claims fail as well.

### C. Breach of Contract

Although not particularly detailed in her complaint or response pleading, Mootoor alleges generally that EKU failed to comply with the terms of the resolution document by dismissing her from the OT graduate program. [DE 1-1 at 7; DE 25-28]. Under Kentucky law, a breach of contract action requires a showing of: (1) the existence of a contract; (2) a breach of that contract; and (3) damages flowing from the existence of a contract. *Huang v. University of Pikeville*, No. 7:18-CV-11-REW, 2019 WL 5929260, *at 5 (E.D. Ky. Nov. 12, 2019) (citing *Metro Louisville/Jefferson Cnty.*

*Gov't v. Abma*, 326 S.W. 3d 1, 8 (Ky. Ct. App. 2009)). To constitute a contract, there must also be "mutual assent by the parties—a meeting of the minds—and also an intentional manifestation of such assent." *Furtula v. Univ. of Kentucky*, 438 S.W. 3d 303, 308 (Ky. 2014). As noted, "[n]otwithstanding the existence of a contract, Courts are generally hesitant to intervene in the affairs of academic institutions." *Suhail v. University of the Cumberlands*, 107 F. Supp. 3d 748, 755 (E.D. Ky. 2015).

In moving for summary judgment, EKU contends that the resolution document, which allowed Mootoor to withdraw from and retake OTS 871, is not a formal contract. [DE 25 at 38; DE 35 at 11]. Mootoor failed to dispute this contention in her response; nor did she explain the contractual elements in her complaint. [DE 1-1; DE 31 at 36-37]. Nevertheless, the crux of EKU's argument hinges on the lack of mutual assent, but the fact that both parties now interpret it differently in and of itself does not necessarily mean that at the time of formation the parties did not have a meeting of the minds. [DE 1-1 at 5, 7-8; DE 31 at 36-37]. "Almost never are all the connotations of a bargain exactly identical for both parties; it is enough that there is a core of common meaning sufficient to determine their performances with reasonable certainty." *Preferred Care of Delaware, Inc. v. Konicov*, No. 5:15-CV-88-KKC-EBA, 2016 WL 2593924, at *10 (E.D. Ky. May 4, 2016) (quoting Restatement (Second) of Contracts § 20 (1981)).

27

Ultimately, there is significant evidence to support the contractual nature of the resolution document. Per the resolution, Mootoor's Fall 2017 OEI complaint was eventually dropped, she received a "withdraw" on her transcript, and she was permitted to retake the failed portions of Field Work Level I and be promptly enrolled into Field Work Level II. [DE 25-28].

Regardless, whether or not the resolution document was a contract, EKU further contends that the resolution was silent on Mootoor's first fieldwork failure's applicability to any future academic issues, and as such, there could not have been a breach. [DE 25 at 37-38; DE 35 at 11-12]. EKU points to the language of the resolution document, which provides, *inter alia*, that "[t]he class will appear as either a Withdraw ('W') or an Administrative Withdraw ('AW') on Ms. Mootoor's transcript, depending on the requirements of the system." [DE 25-28 at 3]. The resolution document also stated that "[b]ecause of accreditation rules that bind the Occupational Therapy Program, if Ms. Mootoor does not successfully complete OTS 871, this will count as her second failure." [*Id.*].

As aforementioned, Mootoor's breach of contract claim is not particularly thorough, and in her response to EKU's Motion for Summary Judgment, Mootoor fails to address the alleged breach. [DE 31 at 36-37]. In essence, Mootoor's main basis seems to be based on an alleged ambiguity in the resolution because "EKU allowed the

28

Plaintiff to withdraw from OTS 871-Field Work I, Rockcastle, but then counted it as her first failure in order to remove her from the program after the VA experience." [DE 31 at 37]. However, contract language is not ambiguous unless it is subject to two reasonable interpretations, and such ambiguity must be apparent on the face of the contract. *Luttrell v. Cooper Industries, Inc.*, 60 F. Supp.2d 629, 631 (E.D. Ky. 1998) (citing *Schachner v. Blue Cross and Blue Shield of Ohio*, 77 F.3d 889, 893 (6th Cir. 1996)). Here, Mootoor does not point to any ambiguous language in the resolution document or to any testimony or extrinsic evidence to support the existence of any ambiguity. Neither does Mootoor provide an explanation for how the resolution agreement impliedly ensured that the OTS 871 failure would not be considered a "failure" for purposes of future courses.

In fact, the language of the resolution document suffers no ambiguity on its face, and the Court will not create an ambiguity where none clearly exists. *Luttrel*, 60 F. Supp.2d at 631. The resolution, which the parties' conduct demonstrates was agreed to, allowed Mootoor's transcript to reflect a withdrawal, rather than a failure of the course. [DE 25-28 at 3]. However, this provision seemingly applied only to the transcript, as the resolution noted that a second failure of OTS 871 would be considered a second failure for purposes of her enrollment in the OT graduate program.

29

[*Id.*]. In any case, Mootoor's reliance on mere allegations is detrimental to her claim.

Mootoor also contends that EKU violated good faith and fair dealing in "holding Plaintiff's failure of OTS 871 Field Work I against her." [DE 31 at 37]. While it is true that "a covenant of good faith and fair dealing is implied in every contract," it is up to the party alleging a breach to "provide evidence sufficient to support a conclusion that the party alleged to have acted in bad faith has engaged in some conduct that denied the benefit of the bargain originally intended by the parties." *KSA Enterprises, Inc. v. Branch Banking and Trust Co.*, 761 F. App'x 456, 460-461 (6th Cir. 2019). As explained above, Mootoor has not met this burden.

Ultimately, Mootoor's breach of contract claim suffers the same problem as her other two claims: "conclusory allegations, speculation, and unsubstantiated assertions are not evidence, and are not enough to defeat a well-supported motion for summary judgment." *Gooden v. City of Memphis Police Dep't*, 67 F. App'x 893, 895 (6th Cir. 2003). Mootoor herself "fails to affirmatively allege actually breaching conduct, and submits no other supporting proof," therefore, "no reasonable juror could find in [her] favor." *Huang v. University of Pikeville*, No. 7:18-CV-11-REW, 2019 WL 5929260, *at 5 (E.D. Ky. Nov. 12, 2019) (citing *Mitchell*, 964 F.2d at 585). Thus, EKU is entitled to summary judgment.

### IV. CONCLUSION

For all the reasons set forth above, each of Mootoor's claims fail as a matter of law and shall be dismissed. Because this action shall be dismissed, the Court will also deny EKU's Motion in Limine [DE 36] as moot. Accordingly, **IT IS ORDERED** as follows:

(1)  EKU's Motion for Summary Judgment [DE 25] is **GRANTED**;

(2)  This matter is **DISMISSED WITH PREJUDICE**;

(3)  Because this matter is dismissed, EKU's Motion in Limine [DE 36] is **DENIED AS MOOT,** and

(4)  This is a final and appealable order.

This the 20th day of September, 2020.



Signed By:

_Joseph M. Hood_

Senior U.S. District Judge